# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# BOWLING GREEN DIVISION
# CRIMINAL ACTION NO. 1:10CR-10-R

UNITED STATES OF AMERICA                                              PLAINTIFF

V.

DARNELL ALLEN                                                           DEFENDANT

## MEMORANDUM OPINION AND ORDER

Defendant, Darnell Allen, has filed a Motion to Suppress Evidence (DN 36). Plaintiff, United States of America, has filed a response (DN 38). A suppression hearing was held on July 20, 2010. Post hearing briefs were filed by both parties (DN 45, 51). Defendant has filed a reply to Plaintiff's brief (DN 53). This matter has now been fully briefed and is ripe for review.

Plaintiff has also filed a motion for an extension of time (DN 50). Defendant had no objections (DN 52). Accordingly, that Motion is GRANTED. For the reasons that follow, Defendant's Motion to Suppress is DENIED.

## BACKGROUND

Defendant operates a commercial motor vehicle for a living. *Suppression Hearing Transcript*, DN 43, pg. 84. On January 22, 2010, Defendant left Carson, California for Plainfield, Indiana. *Id.* at 93. On January 25, 2010, Defendant entered Kentucky on I-65 near Bowling Green where there was a weigh station. *Id.* at 94. Because the station was open at the time, Defendant exited the interstate and drove across the scales. *Id.* Before he was able to return to the interstate, Officer Duvall, working at the station, displayed a red signal to Defendant, indicating that he needed to pull over. *Id.* Defendant pulled his truck over, and Officer Duvall initiated a Level II inspection. *Id.* at 95. First, Officer Duvall checked Defendant's paperwork and the functionality of various mechanical devices. *Id.* After finishing that portion of the inspection, Defendant was asked to leave

his truck and was escorted into the weigh station office. *Id.* at 97. Officer Duvall then returned to the truck and began doing a walk-around inspection of the truck and trailer. *Id.* Upon arriving at the rear of the trailer, Officer Duvall noticed that the doors were sealed with a bolt lock. *Id.* at 16. Officer Duvall also noticed that there was some damage to the rear doors of the trailer. *Id.* at 83. To inspect whether the cargo in the truck was properly secured, Officer Duvall retrieved a set of police issue bolt cutters and removed the bolt lock. *Id.* After opening the trailer doors, Officer Duvall saw some boxes that had fallen off their pallets. *Id.* Because this indicated that the load was not properly secured, Officer Duvall entered the trailer and inspected other pallets. *Id.* at 17. At that time, he saw multiple black garbage bags hidden between some of the pallets. *Id.* Upon seeing the garbage bags, Officer Duvall left the trailer and reentered the weigh station. *Id.* at 18.

At this point, the testimony at the suppression hearing sharply diverged.

## SUPPRESSION HEARING TESTIMONY

Jeremy Duvall, Joey Conn, Brad Harper and Darnell Allen testified at the suppression hearing.

1. Jeremy Duvall

On January 25, 2010, Mr. Duvall was an officer with the Kentucky Vehicle Enforcement Department. His sole responsibility was to conduct commercial motor vehicle inspections. On that date, he was working at a fixed operating facility known as the Simpson County weigh station. These are the truck inspection stations that we all are familiar with that are stationed on many interstates in Kentucky.

He conducted a number of random inspections daily. Mr. Allen's was probably the first of the day and he was chosen randomly. Sergeant Conn was present with him at the weigh station. Mr.

Duvall had Allen park his vehicle. Allen came to the scale facility with some paperwork, and Duvall reviewed a number of documents. Allen was asked to drive his vehicle from the parking lot to the inspection lane, which he did. Mr. Duvall was performing a Level II inspection. He noticed Allen's shipping papers were very vague, as it did not give a clear description of what he was hauling. He asked Allen about it but did not believe he received a "straight" answer.

Duvall stated the second half of the Level II inspection is a walk-around checking the exterior of the tractor and trailer. He testified that load securement was a part of a Level II inspection. Improper securement can affect vehicle stability.

Duvall informed Allen he was going to perform the inspection. Allen did not object. His testimony was not clear that he told him he would perform an interior inspection of the trailer. The trailer had a bolt-style seal. He secured a bolt cutter and removed the seal.

He opened the doors and, before entering, he observed that several medium (12" square) boxes on the right side had fallen and there was unrestrained cargo that could be damaged or possibly cause other problems.

He entered the trailer and climbed on top of the first pallet from which the cargo had fallen to check for other securement problems. Between pallets, he observed black trash bags with an unknown substance in them. He believed it was contraband as the shipping papers did not document anything being transported in black garbage bags.

Duvall returned to the scale facility. Allen and Conn were there. He asked for consent to search the vehicle. Allen responded, "You're already in the trailer." Duvall responded, "I'm asking to consent for your entire truck and trailer." He testified that Allen eventually gave consent, which was witnessed by Conn.

3

Duvall testified that "Whatever is going to be on your shipping papers is what should be in your vehicle." It was not industry standard to transport any common commodity in black trash bags. He felt it was some type of contraband. His search produced several large bags which contained marijuana. He was only there for a few minutes. He returned and placed Allen under arrest and gave him his Miranda warning.

Duvall stated Allen's trip originated in Los Angeles and was to terminate just outside of Indianapolis. He was approximately 300 miles further south than he should have been. Allen was an owner-operator of the company. Such a deviation was unusual as it would cut into his profits.

Duvall stated such an initial in-trailer inspection was very common. He admitted the various manuals made no mention that he could conduct cargo inspections as part of any walk-around inspection. However, his training taught him he could break the seal to check cargo securement and he and other officers did it routinely. He admitted he never asked if he could break the seal.

He testified that after his initial securement inspection and seeing the garbage bags, he returned to talk to Allen, with Conn present. At that time, Allen granted consent. Duvall never personally told Allen he could refuse to consent. However, he felt Allen granted it voluntarily.

The testimony reveals:

"Q. Is there anything that went on that evening up to you cutting the bolt seal, all right, that gave you a reasonable suspicion to believe there was something improper with the way the cargo was being stored?

A. No."

2.  Joey Conn

Joey Conn is a sergeant with the Kentucky State Police, Division of Commercial Vehicle Enforcement, a certified trainer in drug interdiction through the United States Department of

Transportation and Duvall's supervisor. It is common practice to perform cargo securement inspections. They customarily break the seal and replace it with a seal bearing the markings of the Kentucky State Police. At least 30% of the random inspections have the seal broken and the cargo inspected for securement. He was present January 25, 2010.

He was sitting close to Allen and Duvall. He heard the conversation of where the load originated and its destination. Allen explained he deviated because of too many hills and weather concerns. He heard questions about Allen's log book and talk about why Allen would be off work for weeks at a time. He felt all of this was suspicious. Trucks take the best and cheapest route and if the truck is not moving, it does not make money. All of these issues were inconsistent with normal profitable trucking operations. He saw Duvall go to the trailer to check the cargo securement. He was gone a couple of minutes.

Duvall returned and asked for consent to conduct a search of the trailer. Allen responded, "You're going to search it, anyway. Go ahead." Conn intervened stating they were not going to search it anyway. He advised Allen he had a right to refuse the search, but he needed a yes or no as to whether they could or could not search the trailer. Allen responded, "fine, so go ahead."

After that conversation, Allen was handcuffed for officer safety and he and Duvall went to search the trailer where they found the bags of marijuana.

Conn further testified:

"A. If he had said no, I would have talked to Officer Duvall, find out exactly what he had seen in the back of that trailer, not to mention the totality of the circumstances of what -- the objectives of his trip. We would have got a canine. And at that point, he would have been detained until a canine had arrived and done a search.

Q. So you would have continued your investigation?

A. Absolutely, yes, sir.

> Q. At some point in time -- let's assume again, hypothetically, that you brought the canine out and the canine did not alert but you knew everything that you knew. What would you have done?
>
> A. He says no, the canine does not alert, I'm not going to be able to obtain a search warrant, and Mr. Allen goes up the road.
>
> Q. All right. And I know I've asked you this, but did you specifically tell Mr. Allen that he had the right to refuse consent?
>
> A. He made the statement that we had already searched the truck, so go ahead. And I said, "No, we have not searched the truck."
>
> Q. Okay.
>
> A. 'We want to search the truck. Yes or no?'"

Conn did not document any of the statements or consent to search in any of his reports. A written consent was not obtained.

3. Brad Harper

He is employed by Kentucky State Police, Drug Enforcement Special Investigations. He was present and investigated the incident on January 25, 2010. He obtained a statement from Duvall. In the report, it stated:

> "During the walk around, he (Duvall) noticed the right rear trailer door had been damaged or the lock had been tampered with. He removed the bolt seal and checked for proper load securement."

No mention in the report was made of conversations with Allen.

4. Darnell Allen

Darnell Allen has been an over the road commercial owner truck driver for four years. He was familiar with Level I, II and III inspections. He has been randomly inspected over ten times. This was the first time an inspector had broken the seal and climbed into the interior of the trailer. He never consented to an inspection or search.

This trip originated in Carson, California. The bolt seal was installed there by Schenker Logistics. He was instructed not to open it under any circumstances. He was going to Indiana.

After he was stopped for a random inspection in Kentucky, he gave Duvall his paperwork. They did a walk around and checked wipers, signals, etc. Allen went back inside the scale house and Conn was there. During the entire event, Allen had no conversations with Conn.

He saw Duvall cut the bolt seal. He was inside the trailer 20-25 minutes. Duvall returned and asked Allen for permission to search the trailer. Allen told Duvall that he was just in the back of the truck and asked why are you asking now. Duvall stated he did not need his permission and went back out to conduct the search. Allen testified that he would have given permission if asked. However, he stated that he never consented and had no conversation with Conn and Conn's previous statements were false. He also testified that he was handcuffed before Duvall asked permission to inspect the truck. He indicated that he did not specifically refuse permission but he did not consent either. He stated, "I didn't say anything or do anything to indicate permission to search the truck." He testified that he was handcuffed when this discussion occurred.

## DISCUSSION

The parties are in agreement that all of the actions engaged in by Officer Duvall were lawful until he cut the bolt lock from the trailer. The parties disagree as to whether there was a lawful basis for (1) cutting the bolt lock and conducting a cargo securement inspection or (2) the full search of the trailer following the cargo securement inspection.

**1. Cargo Securement Inspection**

The first issue is whether Officer Duvall could lawfully conduct a cargo securement inspection of a locked trailer. Commercial trucking inspections are governed by Ky. Rev. Stat. §

7

281.755, which states:

> (1) The Department of Kentucky State Police or any other peace officer designated by the department may at any time or place make an inspection of any motor vehicle operating under the provisions of this chapter. They may enter into and upon any such motor vehicle for the purpose of ascertaining whether or not any provision of this chapter or any order or rule or regulation of the department relating to such motor vehicles has been violated. Willful refusal to stop any such motor vehicle, when ordered to do so by any representative of the Department of Kentucky State Police, or to permit the representative to enter into or upon the motor vehicle for the purpose of inspection, shall be sufficient ground for the revocation or suspension of the certificate or permit of the motor carrier.

Because, on its face, the statute does not seem to place any limitation on the discretion of the inspecting officer, some case law has suggested that it may run afoul of *New York v. Burger*, 482 U.S. 691 (1987). *United States v. Garrido*, 467 F.3d 971, 980-81 (6th Cir. 2006); *cf. United States v. Dominguez-Prieto*, 923 F.2d 464 (6th Cir. 1991) (finding a statute that required "reasonable belief" of a violation prior to a warrantless stop and inspection constitutional). Defendant contends the statute is constitutional because a "reasonable belief" requirement should be read into the statute. The government contends that, regardless of the constitutionality of the statute, Allen does not have appropriate standing for a facial challenge because Officer Duvall had a reasonable belief that the law was being violated at the time he opened the trailer. *See Garrido*, 467 F.3d at 981-82.

Looking to *Burger*, three requirements must be met to conduct warrantless inspections. First, "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." *Burger*, 482 U.S. at 702. The Sixth Circuit has already determined that this requirement is met in the commercial trucking industry. *Dominguez-Prieto*, 923 F.2d at 468. Second, "the warrantless inspections must be necessary to further the regulatory scheme." *Burger*, 482 U.S. at 702 (internal quotations and edits omitted). As above, the Sixth Circuit has already determined that this requirement is met in commercial trucking. *Dominguez-Prieto*, 923

8

F.2d at 469. Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 703 (internal quotations and edits omitted). Because the Sixth Circuit has not addressed the Kentucky statute in a factually analogous situation, this Court must conduct the appropriate analysis for the final requirement.

To meet the third requirement under *Burger*, "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.* "To perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.* (internal quotations omitted). The Kentucky statute clearly meets this requirement - commercial truck drivers licensed to operate in Kentucky are aware that they could be subject to inspections for the purpose of verifying compliance with Kentucky commercial trucking regulations.

The next requirement, however, is that the inspection "must be carefully limited in time, place and scope." *Id.* (internal quotations omitted). This Court "need not resolve the question of whether Ky. Rev. Stat. § 281.755 would constitutionally permit inspection 'at any time or place,' however," because, similar to *Garrido*, the discretion of the inspecting officer was limited. 467 F.3d at 980-81. In *Garrido* the court avoided examining the constitutionality of the statute because the officers conducting a roadside inspection along with a traffic stop actually had reasonable belief of a violation regardless of whether the statute required such, limiting their official discretion. In this case, Officer Duvall directly testified that he did not have a reasonable belief of a violation of the

9

commercial trucking regulations at the time he conducted the cargo securement inspection. Nonetheless, in the current case, Officer Duvall could only conduct random inspections of trucks passing through the weigh station, limiting the place of inspection. By limiting the place of inspection, the discretion of the inspecting officer is limited in a way similar to *Garrido*.

Random safety and cargo securement inspections conducted at a weigh station also set forth a very clear scope of inspection. First, "[t]he inspections can be made only of [commercial trucking vehicles.]" *Burger*, 482 U.S. 711. Second, "the permissible scope of these searches is narrowly defined:" the inspector may only enter into a vehicle to ensure compliance with Kentucky commercial trucking regulations. *Id.* Limiting the type of vehicle that can be inspected and the scope of the inspection narrowly defines the permissible scope of the inspections. Finally, while there is no limitation on time, "[t]rucks operate twenty-four hours a day and the officers must, necessarily, have the authority to conduct these administrative inspections at any time." *Dominguez-Prieto*, 923 F.2d at 470. With appropriate limits on time, place and scope, the third requirement of *Burger* is met when random inspections are performed at a weigh station.

Since the three *Burger* requirements are met under the facts of the current case, Officer Duvall was lawfully allowed to perform a warrantless inspection to verify compliance with Kentucky commercial trucking regulations while the truck was at a weigh station. *Accord United States v. Ruiz*, 569 F.3d 355 (8th Cir. 2009); *United States v. Burch*, 153 F.3d 1140 (10th Cir. 1998).

**2. Search of the Trailer**

After the completion of the safety inspection, the officers had a "reasonable suspicion justifying further detention." *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006). Officer Duvall had lawfully observed black garbage bags in the truck that did not likely hold any of

Defendant's stated cargo. In addition, it is undisputed that Defendant was off the most direct route between his start and end point, which Officer Conn said he considered when deciding to continue investigating after the safety inspection. Officer Duvall thought that the shipping papers and Defendant's answers were vague as to what was being hauled. Finally, Officer Conn noticed that the truck had long periods of down time, which was indicative of unlawful activity to Officer Conn.

While the continued detention was lawful under a reasonable suspicion standard, reasonable suspicious does not justify a full lawful search of the trailer at the time of detention by the officers. There is a dispute as to whether Defendant gave consent to the search, which would have made the search lawful. The government obtained no warrant in the current case. Finally, since a cargo securement inspection does not involve investigating the contents of bags stored in a truck, the government cannot justify the search under *Burger* as discussed above.

Before deciding whether consent was valid, this Court will first consider any potential applicable exceptions to the warrant requirement of the Fourth Amendment. The exception most likely to apply in the current case is the so-called "automobile exception" established in *Carroll v. United States*, 267 U.S. 132 (1925). This exception allows officers to search an 'automobile' without a warrant if there is probable cause to believe that the vehicle contains contraband. *Id.* at 147. The Supreme Court has "consistently recognized ready mobility as one of the principal bases of the automobile exception." *California v. Carney*, 471 U.S. 386, 390 (1985). In this case, the trailer was hooked to a tractor and was being moved along the interstate. Accordingly, the ready mobility requirement is met. A more recent rationale behind the automobile exception is the "lesser expectation of privacy" associated with "pervasive regulation of vehicles capable of traveling on the public highways." *Id.* at 391. As discussed above, this is particularly true for a commercial tractor-

trailer when compared to a standard passenger car. As a result, Defendant's trailer is an automobile for the purposes of the automobile exception. *Accord, e.g.*, *United States v. Navas*, 597 F.3d 492 (2d Cir. 2010); *United States v. Diaz*, 356 Fed. Appx. 117 (10th Cir. 2009); *United States v. Steed*, 548 F.3d 961 (11th Cir. 2008); *United States v. Ibarra*, 496 F.3d 526 (5th Cir 2007); *United States v. Forrest*, 620 F.2d 446, 453 (2d Cir. 1980).

The final requirement necessary to apply the automobile exception is probable cause. As discussed above, the officers were aware of the following facts: (1) Defendant was 300 miles off route, which is generally associated with drug activity; (2) Defendant claimed to be off route because of "weather and hills," which Officer Conn testified was an excuse used in connection with drug activity; (3) Officer Duvall had trouble establishing what Defendant had in his trailer after inspecting Defendant's papers and orally questioning Defendant; (4) Defendant had long periods of down time, which Officer Conn testified was consistent with drug activity; and (5) Officer Duvall observed black plastic bags during a lawful cargo securement inspection and those bags were inconsistent with the shipping papers and the rest of the cargo.

"Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is found to exist when there is a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). Probable cause is based on the collective knowledge of all officers at the time of the search. *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989). Accordingly, despite the fact that only Officer Duvall was aware of the presence of the bags and only Sergeant Conn found Defendant's route and downtime suspicious, this Court considers all the facts together when determining probable cause.

In light of the officers' training and experience, taking the facts discussed above as a whole, there was not probable cause to search the trailer. While no Sixth Circuit precedent is directly on point, other circuits finding probable cause in similar situations have involved substantially more evidence. *United States v. Castelo*, 405 F.3d 407, 412 (5th Cir. 2005) (probable cause when (1) illegal alteration of expiration date of registration, (2) inability to recall where the trailer was loaded, (3) trailer unsealed, (4) Long delay in known drug "source city," (5) abnormal nervous behavior); *United States v. Diaz*, 256 Fed. Appx. 117, 124-25 (10th Cir 2009) (finding probable cause to search a trailer based on multiple factors). Even the officers themselves did not believe that they had probable cause in this case. At the suppression hearing, Officer Conn testified that, had Defendant not given consent, a canine would have been called in. *Suppression Hearing Transcript*, DN 43, pg. 65. Had the canine not alerted to the presence of drugs, Conn testified he was "not going to be able to obtain a search warrant, and Mr. Allen goes up the road." *Id.* at 66. Given the precedent that has found probable cause to search for drugs and the officers' own belief that probable cause did not exist, there was no probable cause to search the trailer in the instant case.

The search was not justified by the automobile exception. Accordingly, this Court continues to an analysis of whether Defendant consented to the search.

**3. Consent**

"It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search. Consent to a search may be in the form of words, gesture, or conduct. In whatever form, consent has effect only if it is given freely and voluntarily." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (internal quotations and citations omitted). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact

13

to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Consent must be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992). The government must demonstrate consent by a preponderance of the evidence. *United States v. Hinojosa*, 606 F.3d 875 (6th Cir. 2010).

In looking at voluntariness, the Court may consider "'the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.'" *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). Although it is a factor to be considered, it is not essential that the government demonstrate consent was given with knowledge of the right to refuse consent. *Schneckloth*, 412 U.S. at 234.

The consent analysis varies depending on whether the initial entry was unlawful or lawful. While the Court found the initial entry lawful, to preserve the record this Court will address both situations.

### a. Unlawful Entry

Following an unlawful entry to the trailer, there is an added twist to consent. "When consent follows an illegal search, the Government must demonstrate that the consent was '*sufficiently* an act of free will to purge the primary taint of the unlawful invasion.'" *United States v. Haynes*, 301 F.3d 669, 682 (6th Cir. 2002) (quoting *Brown v. Illinois*, 422 U.S. 590, 599 (1975) (other quotations omitted) (emphasis in original). This act of free will can be hindered because "[a] suspect's knowledge of a prior illegal search can give rise to a sense of futility." *Id.* at 683. After witnessing

14

an illegal entry, a person may believe that refusing consent "would be a bit like closing the barn door after the horse is out." *Id.*

In the current case, Defendant acknowledged at the suppression hearing that he knew he had a right of refusal. Additionally, this Court credits the testimony that Defendant was specifically *advised* of his right to refuse consent prior to granting consent. Finally, Defendant likely did not feel that the previous search had rendered his current situation futile. Rather, Defendant testified that had he been asked for consent to search his trailer from the outset of the stop, he likely would have granted consent. *Id.* at 99. While this does not ease the requirement that the officers obtain valid consent, is does help demonstrate the state of mind of Defendant throughout this stop and negates any futility argument.

Defendant stated his consent in front of two officers. Defendant was both aware of and informed of his right to refuse consent. Finally, because Defendant acknowledged that he was willing to grant consent from the start of the search, he likely did not feel the futility described by the Sixth Circuit when approached for consent after witnessing an unlawful entry. As a result, Defendant's consent was knowing, voluntary and valid.

### b. Lawful Entry

If the initial entry was lawful, the showing required for consent is lower than if it was not. Because consent was valid even if the initial entry was unlawful, consent would also be valid, for the reasons stated above, following a lawful entry by Officer Duvall.

### CONCLUSION

For the forgoing reasons, Defendant's Motion to Suppress is DENIED. The initial inspection was justified under the Kentucky regulations because it was a random inspection conducted at a

weigh station. However, the initial inspection only allowed Officer Duvall to observe the bags, not to search them. Looking at the totality of the circumstances, the officers did not have probable cause to conduct a full search of the trailer and as a result the automobile exception does not apply to excuse the warrantless search. Accordingly, this Court continued to analyze Defendant's consent.

The testimony of Sergeant Conn and Officer Duvall was credible and consistent. When asked for consent to search his trailer, Defendant assented. Defendant's assent was knowing and voluntary. Accordingly, the consent is valid and justifies the search of the trailer.

The Motion for an Extension of Time is GRANTED. Defendant's Motion to Suppress is DENIED.

IT IS SO ORDERED